UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAMUEL S. GUZIK, *d/b/a* GUZIK &
ASSOCIATES,
                             Plaintiff,

                -v-

DARA S. ALBRIGHT,
                             Defendant.

16-CV-2257 (JPO)

<u>FINDINGS OF FACT
AND
CONCLUSIONS OF LAW</u>

J. PAUL OETKEN, District Judge:

This case involves a dispute between a lawyer and his former client. There are three claims at issue. Plaintiff Samuel S. Guzik seeks to recover in quantum meruit for legal services rendered prior to his resignation, which Guzik contends was in fact a constructive discharge. Defendant Dara Albright asserts counterclaims against Guzik for defamation and intentional infliction of emotional distress.[1]

The general background of this litigation is described in the Court's prior opinions in this case. *See Guzik v. Albright*, 2018 WL 4386084 (S.D.N.Y. Sept. 14, 2018); *Guzik v. Albright*, 2017 WL 3601244 (S.D.N.Y. Aug. 21, 2017); *Guzik v. Albright*, 2016 WL 6952347 (S.D.N.Y. Nov. 28, 2016).

A bench trial was held from July 16 through July 18, 2019.[2] The Court now issues its findings of fact and conclusions of law.

---

[1] Albright previously asserted additional counterclaims, but those counterclaims were dismissed on summary judgment (Dkt. No. 204) or voluntarily dismissed before trial (Tr. 4).

[2] Both parties waived their right to a jury trial on March 22, 2019. (*See* Dkt. No. 254, at 3.)

## I. Findings of Fact

The Court finds the following facts by a preponderance of the evidence based on the trial testimony and the documents admitted as evidence.

Samuel Guzik is a lawyer who graduated from Stanford Law School in 1978. He spent two years working as an associate at a law firm in New York, but since 1980 he has worked primarily as a lawyer in Los Angeles. In 1993, he formed Guzik & Associates. For several years he has done work in securities law, and in recent years he has developed expertise in crowdfunding, Regulation A-Plus, and the JOBS Act of 2012.

Dara Albright is a co-founder of LendIt Conference LLC ("LendIt"), a company focused on organizing events relating to marketplace lending and crowdfunding. She also founded a company called NowStreet LLC. She has planned and participated in numerous events relating to the crowdfunding industry.

In December 2013, Guzik met Albright at an industry event. Guzik initiated further contact, and they began communicating with each other about webinars and other industry events. (Tr. 39; 188; DX B; DX C; DX E10.)[3]

In May 2014, Guzik called Albright to discuss a scheduled webinar event. During that call, he learned about a dispute that had arisen between Albright and "Crowdnetic," the business name for Goodworld Creations LLC. As Guzik learned, Albright had previously held a one-third interest in LendIt through her company NowStreet, but she had entered into an agreement with Crowdnetic to transfer her interest in NowStreet to Crowdnetic. Albright now wanted to unwind

---

[3] "Tr." refers to the trial transcript. "PX" refers to Plaintiff's exhibits. "DX" refers to Defendant's exhibits.

or rescind that transaction because she believed that Crowdnetic and its principal, Luan Cox, had failed to comply with the parties' agreement.

Guzik began providing advice to Albright regarding her dispute with Crowdnetic in May 2014. He began communicating with counsel for Crowdnetic in late May. On May 27, Guzik sent to Crowdnetic's counsel a settlement proposal that included the return of Albright's ownership interest in NowStreet. On May 28, Cox, on behalf of NowStreet (a one-third owner of LendIt) purported to remove Albright from LendIt's board of managers. (PX 83.) Also on May 28, Crowdnetic's counsel sent Guzik a settlement proposal, which included providing Albright with a partial interest in Crowdnetic and 40 percent of certain cash proceeds owed by LendIt to Crowdnetic. (PX 50.) Albright found Crowdnetic's proposal unacceptable. She wanted the return of 100 percent of her interest in NowStreet (which would carry with it a return of her former entitlement to one-third of LendIt), a position that she maintained through late 2015. (Tr. 61-62.) Guzik wrote to Crowdnetic's counsel, accusing Cox of perpetrating a "fraudulent scheme to defraud" Albright, accusing Crowdnetic of "recalcitrance," and threatening litigation. (PX 80; 83.)

In response, on May 29, 2014, Crowdnetic filed a declaratory judgment lawsuit against Albright in the Southern District of New York. The Crowdnetic action (*GoodWorldCreations d/b/a Crowdnetic v. Albright*, 14-CV-3848 (S.D.N.Y.)) was assigned to Judge Thomas Griesa. Guzik represented Albright in the Crowdnetic action, filing an appearance on June 12, 2014, and an answer and counterclaims on June 16, 2014.

Meanwhile, the Crowdnetic dispute gave rise to related disputes with LendIt on the part of both Crowdnetic and Albright due to NowStreet's ownership interest in LendIt. Guzik also began advising and representing Albright in connection with the brewing dispute with LendIt.

Albright continued to have a business relationship with her fellow co-founders of LendIt — and continued doing work for LendIt at least until September 2014 — but that relationship became strained as a result of the ongoing dispute between Albright and Crowdnetic/Cox. (*See, e.g.*, PX 48; Tr. 391-97.)

Guzik and Albright never entered into a written agreement with respect to Guzik's representation or fees. However, on June 3, 2014, Guzik sent Albright an email that read in part:

> [W]hile I cannot try this case, I will do everything necessary to bring this to a successful conclusion – which means, at least, the return of NowStreet. There will be some initial costs (filing fee, bar certifications). Otherwise, you will owe me nothing unless I succeed. Failure is not an option.
> …
> If I succeed, we can work something out that makes sense to you. Under California law, an individual's maximum liability for fees is $1,000 in the absence of a written fee agreement to the contrary. So you don't even need to trust me on this. Hopefully, you can.

(PX 45.) Guzik's statement about Albright's "maximum liability," by itself, was arguably misleading. In fact, and as Guzik aware, Albright could potentially be liable for the value of his services in quantum meruit, even without a written fee agreement. (Tr. 71-72.) Guzik testified that he and Albright also had several oral communications beginning around this time, and that they agreed that "we would work out something that we both considered to be fair, based upon the outcome, because it was contingent." (Tr. 72.)

In any event, Guzik continued representing and advising Albright on these matters through the summer of 2014, without any clear agreement or understanding between the parties about what, if anything, Albright would owe Guzik for his work. At that point, the parties had a vague understanding that they would work out an arrangement later, whereby Guzik would recover some unspecified percentage of a favorable settlement. The parties did not discuss the issue of fees again for over a year — until September 2015. (Tr. 73-74.) Guzik himself admitted

that, from May 2014 until September 2015, the parties "didn't have a specific arrangement" about fees. (Tr. 74.) Then, in September 2015, Guzik testified, he and Albright discussed a one-third contingency fee arrangement, with Albright at that point stating that one-third "works for her." (Tr. 75.) Albright did not specifically contradict Guzik's testimony about that conversation, although she testified that as of early December 2015 she "didn't know what Mr. Guzik's legal fees were going to be." (Tr. 466.)[4]

On July 23, 2014, LendIt provided notice to Crowdnetic and Albright, through counsel, that it planned to exercise its right to purchase the one-third interest in LendIt held by NowStreet pursuant to Section 7.11 of LendIt's operating agreement. (PX 177.) Unwilling to let go of the ownership interest it believed it held (through NowStreet) in LendIt, Crowdnetic sought to prevent LendIt from asserting its purported Section 7.11 buyback rights. After informal efforts to resolve this dispute failed, in September 2014 Crowdnetic filed a demand for arbitration against LendIt under LendIt's operating agreement. Crowdnetic was then battling on two fronts — Albright on one and LendIt on the other — with all the disputes largely focused on who had a piece of, and a role in, LendIt.

In early August of 2014, Guzik and Albright had a brief falling out, in what turned out to be a foreshadowing of things to come. As Albright's litigation against Crowdnetic became complicated by LendIt's Section 7.11 exercise, Guzik began feeling that Albright was withholding facts from him, particularly about her dealings with LendIt. Albright held out hope that LendIt's principals (her fellow co-founders) would return an interest in LendIt to her if the

---

[4] For reasons the Court will explain, the presence or absence of an oral agreement is ultimately immaterial to the outcome of this case, and so the Court makes no finding as to whether the parties reached a specific oral agreement regarding a one-third contingency fee in September 2015.

Section 7.11 buyback proved successful, and she did not want to antagonize them. Guzik thought she should not trust them. Guzik testified that Albright instructed him not to communicate with LendIt's attorneys; Albright testified that she merely told Guzik not to "threaten" LendIt's attorneys. (Tr. 93, 98, 390; 494-96.) Guzik testified that he "lost trust" in Albright and "lost control" of the case. (Tr. 98.) As a result, Guzik informed Albright that he was withdrawing from the representation on or about August 1, 2014.

Within two or three days, however, Guzik and Albright had a conversation in which they resolved their disagreements. Specifically, Guzik told Albright that he would continue to represent her "only if I could have complete control over every aspect of the case." (Tr. 99; *see also* Tr. 231 (Albright "was to relinquish complete control of the settlement negotiations over to [Guzik]").) This was a "condition of [Guzik's] continued representation of her." (Tr. 99.) When Albright agreed, Guzik's representation recommenced. (*Id.*)

There was a hiatus in settlement discussions from late 2014 until October 2015. During this period, there was some limited activity in the Crowdnetic action, largely involving motion practice.[5] Guzik continued to represent Albright in that action.

In October 2015, the parties in the Crowdnetic action attended a settlement conference before Magistrate Judge Gabriel Gorenstein. Albright continued to insist on the return of 100 percent of her interest in NowStreet, even though LendIt had since taken steps to acquire NowStreet's interest in LendIt. The settlement conference was unsuccessful.

---

[5] Albright's and Crowdnetic's motions to dismiss the competing claims against them were pending from September 2014 until August 2015, when Judge Griesa denied Albright's motion and partially granted Crowdnetic's motion. (*See GoodWorldCreations d/b/a Crowdnetic v. Albright*, 14-CV-3848, Dkt. Nos. 32, 34, 50, 52.) In September 2015, Judge Griesa denied a motion for reconsideration filed by Guzik on Albright's behalf. (14-CV-3848, Dkt. No. 62.)

In November 2015, settlement discussions between Albright and LendIt began again. LendIt's counsel suggested to Guzik that their clients speak directly to one another, without attorneys present. So on November 18, 2015, Albright participated in a telephone call directly with Jason Jones, a co-founder and principal of LendIt. (Tr. 115-16.) On the call (and as Albright then relayed to Guzik), Jones proposed a settlement that did not include any equity in LendIt for Albright, but did include a sales role for her and financial payment for that role. (Tr. 442-44.) Jones also asked Albright whether Guzik was working on a contingency, and Albright informed him, in substance, that he was. (Tr. 116-17; 445-47.) Albright was angry and upset about LendIt's settlement offer, because she wanted an equity interest in LendIt. (Tr. 444-45, 452.) Around this time, Albright suspected, but did not know, that LendIt might be receiving a valuable buyout offer, and she shared that suspicion with Guzik. (Tr. 120-22; 450-52.)

In late November 2015, LendIt's counsel sent an email to Guzik proposing another settlement discussion between Albright and LendIt with no lawyers present, this time in person. (PX 142; Tr. 125.) Albright informed Guzik that she would not meet with LendIt without her lawyer present, so Guzik rejected the proposal for a face-to-face meeting without lawyers. (Tr. 125-27.)

LendIt's counsel then proposed a meeting in mid-December with lawyers present. Instead of agreeing to the meeting outright, Guzik sent a lengthy email to LendIt's counsel on December 1 outlining Albright's settlement position, with a BCC to Albright. (Tr. 127-29; PX 119.) Guzik's email was intended "to make it clear we didn't want to meet with them in New York unless they were prepared to offer her more than 22 percent [equity in LendIt]." (Tr. 129-30.) As Guzik explained, Albright could have settled with Crowdnetic back in May 2014 and received 40 percent of NowStreet, which would have amounted to an equity interest in LendIt of

between 13 and 14 percent (40 percent of one-third), but the attorney's fees and costs Albright had incurred since that time meant that by December 2015 she would need 22 percent in order to achieve a comparable outcome. In response to Guzik's email, counsel for LendIt agreed to meet, and a meeting was scheduled for December 16, 2015, in New York.[6] (PX 170.) Before the December 16 meeting, Guzik understood the 22-percent figure to be a "floor" below which Albright would not settle, and he testified that Albright indicated her agreement with that position. (Tr. 136-38.) Going into the December 16 meeting, Albright understood their strategy to be that, if LendIt was unwilling to offer a sufficient equity position in LendIt, then Guzik would "put pressure" on LendIt, including by intervening in the pending arbitration between LendIt and Crowdnetic and issuing subpoenas to LendIt in connection with the Crowdnetic action pending in the Southern District — a strategy referred to as "Plan B." (Tr. 474-75.)

On December 16, 2015, Albright and Guzik met with LendIt's principals and LendIt's counsel in New York. LendIt's attorney began the meeting by stating that LendIt had indeed received a buyout offer, which was worth between 50 and 100 million dollars and involved an earnout structure. (Tr. 134-35; 469-71.) The principals then had a discussion among themselves, which was proceeding amicably. (Tr. 480-81.) At that point, Guzik became agitated and began speaking and acting aggressively.[7] LendIt's counsel suggested a break because things were getting "heated." (Tr. 481.) Guzik and Albright went into a private room.

---

[6] At some point after the November 18 call between Albright and Jones, but before the December 16 meeting, LendIt conveyed a revised settlement offer to Guzik. That offer included an option with a five-percent equity interest in LendIt. Albright rejected the offer. (Tr. 146; 447-49.)

[7] Albright testified that Guzik "blew up," becoming agitated, "yelling and screaming" and "making threats." (Tr. 467-77, 479, 481.) Guzik denied that he was "yelling or screaming at anybody." (Tr. 141.) The Court finds that Guzik likely became agitated and took an aggressive, belligerent approach. This finding is based on Albright's credible testimony and the combative, threatening tone of numerous emails written by Guzik.

In the private room, Albright told Guzik, "I just really want to settle this and move on with my life." (Tr. 482.) She told Guzik that she wanted to settle for a smaller portion of equity than he wanted to demand. Guzik testified that Albright told him at this point that she wanted to settle for 15 percent and $300,000. (Tr. 142.) Albright informed Guzik that she had received a medical diagnosis from her doctor the night before, and as a result, she told him, "I just want to be done with this litigation, and I want to settle it today." (Tr. 482; *see also* Tr. 246.) Guzik said to her: "You're leaving too much money on the table, this is my money too, and my wife will kill me if we settle."[8] (Tr. 483.) Guzik argued that "these guys aren't your friends" and said he wanted to demand a 28-percent equity interest. Albright reluctantly agreed. (Tr. 144; 477-78; 483.) Guzik proceeded to convey the 28-percent demand to LendIt. (Tr. 147; 477-78.) LendIt's counsel rejected that demand, stating that the parties were too far apart, so they were "done for the day." (Tr. 148; 477-78.) Guzik then spoke angrily with LendIt's counsel; he "read him the riot act," accused him of "bad faith," and threatened to subpoena LendIt for documents and testimony. (Tr. 149-50.) Guzik and Albright then left the meeting. (Tr. 151; 479; 484.)

Later on December 16, following the settlement meeting, Jones sent an email to Albright. In the email, Jones proposed further settlement discussions "without attorneys." (PX 145; Tr. 484.) Albright told Guzik about Jones's email and forwarded it to him. (Tr. 152-53; 485.) Guzik viewed this email as LendIt "trying to engage with [Albright] to reach a deal without me." (Tr. 154.) Guzik became suspicious that Albright had communicated with Jones before the December 16 meeting and that they had discussed a plan to exclude Guzik. His suspicion was based in part on Albright's expressed desire to settle for 15 percent — roughly two-thirds of the 22-percent floor that Guzik had communicated to LendIt or, in other words, the amount Albright

---

[8] Albright testified credibly to this statement, and the Court credits her testimony.

would have ultimately come away with if Guzik had managed to secure a 22-percent settlement and had then collected his one-third contingency fee.  (Tr. 155-57.)

On the night of December 16 and into the morning of December 17, Guzik sent Albright a flurry of emails, ranging from dramatic to angry to offensive.

At 5:52 p.m. Guzik wrote:  "Time to inflict some pain.  It really is easy."  (DX F2.)

At 7:30 p.m. Guzik wrote:

I am about to get real nasty with these folks . . . .  My recommendation is that we send out a document subpoena ASAP unless they show tangible good faith . . . they need to see some consequences to their actions – *if you don't agree you will need to find a new attorney.  I cannot be undercut by my client after all this – would rather just walk away.*  Sorry to be so blunt. – but today was a big disappointment for me – and not in the financial sense[.]"

(DX H2 (emphasis added).)

At 12:08 a.m. on December 17 Guzik wrote:

I do not know how this is all going to play out.  But today was one of the most disconcerting days of my life.

I feel as though the rug was pulled out from under my feet – not by LendIt – but by you.  LendIt obviously feels as though they can get around me and get to you.

I do not know why this is. . . .  But regardless, it has undermined my confidence in your judgment in this matter, which seems to be clouded too much by emotion.  They clearly feel they can manipulate you emotionally – and they will continue to have that expectation.

This adds an element that I did not bargain for, and frankly I am not certain how to address this at this point.

While this litigation may be an emotional catharsis of sorts for you, this is serious business for me, and has been for quite some time.
…
And knowing that at any time you could throw in the towel, have a side call with Jason Jones – or otherwise undermine what I have been trying hard to accomplish.

So frankly, my head is not in a good place right now – as there now appears to be no one I can trust in this case – not even my own client.

(PX 175.)

At 12:58 a.m. Guzik wrote:

Also, btw, you need to do some soul searching of your own before you go any further with this litigation. I do not believe you have the heart to negotiate against LendIt. You did not in the summer of 2014 – you did not have the will to do it today.

And Jason [and LendIt's other principals] know it. If you have any doubt, read their email to you today. They are playing you, and will continue to have this expectation.

*So if this is how you want all of this to end – so be it.* But that is a very different plan tha[n] I have been operating under for the past 19 months.

*If you want to throw in the towel today with LendIt, and hope that Crowdnetic wants to settle, that is your decision.* But I have done all this work to weaken Crowdnetic, so that you – and not LendIt – would get the benefit of my hard labor. I have no desire to go forward working to advance the interests of LendIt, while they screw you and me – and line their pockets. I am not wired that way. Never will be. *Would rather walk away from this trainwreck and chalk it up to life experience.*

(PX 175 (emphases added).)

The next day, December 17, 2015, Guzik and Albright had a telephone conversation. Guzik told Albright that he wanted to put pressure on LendIt by proceeding to Plan B — issuing subpoenas to LendIt and going forward with the deposition of Luan Cox. (Tr. 485-87.) Albright responded: "Sam, I'm the client; it is my decision, and no, we're not doing that. Let's just settle this." (Tr. 488.) Guzik then responded, "I quit," and hung up the phone. (*Id.*)[9]

Guzik followed up with an email to Albright on December 17. Guzik's email read in part:

---

[9] The Court credits Albright's testimony about the conversation in which Guzik resigned. Guzik's testimony is broadly consistent with Albright's. Guzik testified that when he proposed moving forward with subpoenas against LendIt, Albright "said absolutely not," "[did not] want to do anything adverse to [LendIt]," and "wanted to turn over control of the federal action to LendIt." (Tr. 163.) In response, Guzik testified, "I told her I was resigning." (Tr. 164.)

This letter will confirm my advice to you this morning that I am forced to resign from representing you in the above-referenced action.

I understand that you have other qualified counsel who is willing and able to represent you in this action.

Accordingly, kindly have your new counsel furnish me with a substitution of counsel which I will sign and will be effective upon filing with the court.
…
As I advised you in August 2014, when I was forced to tender my resignation, I believe your judgment has been clouded by emotion. Unfortunately this same dynamic has resurfaced 16 months later, and based upon our conversation this morning will materially impact my efforts to bring this matter to a timely conclusion.
…
Please be further advised that I will cooperate in every way possible to transition this matter to your new counsel.

(PX 116.)

Following Guzik's resignation on December 17, Albright informed Jones that evening that Guzik had resigned and was no longer her attorney, and that LendIt's counsel should no longer communicate with Guzik. (Tr. 380, 383-84.)

On December 17, 2015, without Guzik's involvement, Albright reached a settlement with LendIt, whereby LendIt provided Albright a 15-percent equity interest in LendIt. (Tr. 501.)

On December 29, 2015, Albright sent an email to LendIt's counsel and Crowdnetic's counsel introducing them to her new counsel. The email stated:

I'd like to introduce you to Darius Chafizadeh . . . and Kenneth Rudolph . . . [,] who will be replacing Sam Guzik as my counsel. . . . As [Crowdnetic's counsel] has known for quite some time, our intention had always been for trial lawyers to step in and replace Sam once the federal case reached a certain point. With the discovery upon us and depositions about to commence (starting with Luan Cox's deposition currently scheduled for January 20th), this seemed to be the ideal time to make the transition should settlement not be reached.

(PX 169.) Albright did not inform counsel for Crowdnetic that Guzik had resigned, for obvious reasons. As she credibly testified, "I was in a litigation with Crowdnetic. I wasn't going to go

tell them that my attorney just quit on me. That would raise a million red flags and put me in a very vulnerable position." (Tr. 386.) Nothing in this email undermines the Court's finding that Guzik resigned on December 17, 2015.

At the time of Guzik's resignation, Crowdnetic had filed a motion for partial summary judgment in the action before Judge Griesa, and an opposition brief was due in late December. Prior to Albright's deadline, but after his resignation, Guzik sought and obtained a stipulation for an extension of time for the filing of Albright's opposition brief. (Tr. 171; 14-CV-3848, Dkt. No. 92.) Albright's new counsel, Chafizadeh, filed an appearance in the case on January 4, 2016. (*Id.*, Dkt. No. 93.)

Following his resignation, Guzik did not present Albright with any specific demand for fees for nearly three months. Indeed, on January 6, 2016, Guzik wrote a conciliatory email to Albright, apologizing for his behavior and seemingly accepting some blame for the demise of their relationship:

> [I]t is obvious that in mid-December we were looking at the same "problem" through different lenses, though we shared the same overall objectives. . . . [M]y thoughts and actions were only in good faith and with only your best interests in mind. What I did not account for at that time were what appear to be personal goals regarding the outcome of this matter – in particular as concerns your relationship with LendIt.

(DX A4.) He did go on to mention his "financial interest," suggesting that "it is perhaps best to leave this be until such time as you can assess the final outcome and my relative contribution." He did not, however, make reference to a one-third contingency. (*Id.*; Tr. 280.)

On February 2, 2016, Chafizadeh filed a notice informing Judge Griesa that the parties had reached a settlement in principle. (14-CV-3848, Dkt. No. 96.) This was when Guzik learned that the parties had reached a global settlement in his absence. On February 3, Guzik proceeded to send a series of hostile emails to Chafizadeh and Albright, complaining about a

wide range of injuries to himself, mostly due to LendIt's conduct, but also suggesting that he was entitled to unspecified attorney's fees based on his work on Albright's behalf.  (DX X4; DX B5; DX D5.)

On February 5, Guzik sent an email to Albright that seemed to express resignation with the situation:

> This week alone I made a simple request to understand what was involved in the publicly reported "agreement in principle."  The week is coming to a close and I remain in the dark. . . .
>
> For this reason alone *I choose to move on.  I have no expectation of receiving any compensation from you at this juncture.  Nor do I wish to engage in any negotiations with any client over fees.*  I have a long history of satisfied clients, and I want to keep it that way.
>
> If there is to be any relationship between us going forward, it must rest on trust and candor.  This clearly is lacking.  It is mind numbing to me that after 19 months devoted to advancing your interests that you will not share, on a confidential basis, the details of a publicly referenced agreement in principle.  *On this basis alone, I have made a decision to move on as this, for me, was the final straw.*

(DX E5 (emphasis added).)  He went on to say that LendIt is "a far different matter" because they "tangled with the wrong person . . . and did so for less than honorable motives."  (*Id.*)

On February 27, 2016, Guzik sent notice of a charging lien to counsel for Crowdnetic, LendIt, and Albright, and filed the notice on the docket.  (PX 112; Tr. 173-74; Tr. 291; 14-CV-3848, Dkt. No. 100.)

On March 12, 2016, Guzik sent Albright a "final invoice and offer in compromise" reflecting a "discounted" amount of $960,000.  (DX I6; DX Z9.)  Albright rejected this offer.  (DX W6.)  On March 25, Guzik emailed Chafizadeh stating, "Your client is not a 'victim.'  She is a perpetrator, and will be dealt with accordingly, with the full protection of all applicable laws."  (DX X6; Tr. 311.)

On March 28, 2016, Guzik filed this action.

On May 19, 2016, Guzik sent Albright another rambling email.  It began by referencing allegations in Albright's counterclaims that Guzik had "stalked" and "harassed" her, and ended with the following:

> Instead, as will be outlined to the jury in my trial counsel's opening statement, it is *your* conduct – and *your* unfulfilled expectations – which precipitated the events at issue in December 2015 – and thereafter:
>
> *"Heaven has **no** rage like love to hatred turned / Nor **hell** a **fury** like a woman scorned."*
>
> Yes, as you have advised me in recent weeks, this dispute is *not* about money – it is a personal vendetta – lest it would have been resolved – simply and civilly – a long time ago.

(DX I9 (emphasis in original); *see also* DX L9.)


## II.    Conclusions of Law

This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because Guzik and Albright are citizens of different states (California and Georgia, respectively) and the matter in controversy exceeds $75,000, exclusive of interest and costs.

New York law governs the parties' common law claims.  *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (explaining that it "is sufficient to establish choice of law" if "the parties agree that New York law controls").

### A.    Guzik's Quantum Meruit Claim

The Court incorporates the pertinent legal standards applicable to the quantum meruit claim as set forth in the Court's opinion on summary judgment dated September 14, 2018.  *See Guzik v. Albright*, 2018 WL 4386084 (S.D.N.Y. Sept. 14, 2018).

A quantum meruit claim has four elements under New York law: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are

rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000)). An attorney who resigns from representation, however, forfeits "any right to recover damages for services rendered on the basis of quantum meruit" unless the resignation was for good cause. *Allen v. Rivera*, 509 N.Y.S.2d 48, 50 (App. Div. 2d Dep't 1986); *see also Stair v. Calhoun*, 722 F. Supp. 2d 258, 267 (E.D.N.Y. 2010) ("[A]ttorneys who terminate their representation are still entitled to enforce their charging liens, as long as the attorney does not withdraw without 'good cause' and is not discharged for 'good cause.'").

Because Guzik resigned from representing Albright, he has the burden of establishing that he had good cause to withdraw.

"Under New York law, good cause for withdrawal exists where there are 'irreconcilable differences . . . with respect to the proper course to be pursued in [the] litigation,' where 'the client flatly challenged [counsel's] loyalty and professional integrity,' or where 'the relationship between plaintiff[s] and [their] attorney ha[s] deteriorated to the point where further representation [is] inappropriate.'" *Karimian v. Time Equities, Inc.*, No. 10 Civ. 3773, 2011 WL 1900092, at *4 (S.D.N.Y. May 11, 2011) (alterations in original) (quoting *Lake v. M.P.C. Trucking Inc.*, 718 N.Y.S.2d 903, 904 (App. Div. 3d Dep't 2001)). However, withdrawal based on a client's "unreasonably difficult" behavior is permitted only in relatively extreme situations where, for example, the client hired "new or additional counsel who interferes with the strategies of the original attorney" or subjected the attorney to "insults, lying, foul language, accusations of unprofessional behavior, lack of cooperation, and [a] failure to communicate." *Louima v. City of New York*, No. 98 Civ. 5083, 2004 WL 2359943, at *61 (E.D.N.Y. Oct. 5, 2004) (first quoting

N.Y. Comp. Codes R. & Regs. tit. 22, § 1200; last quoting *Casper v. Lew Lieberbaum & Co.*,

No. 97 Civ. 3016, 1999 WL 335334, at *2 (S.D.N.Y. May 26, 1999)), *aff'd sub nom. Roper-*

*Simpson v. Scheck*, 163 F. App'x 70 (2d Cir. 2006). The relevant "good cause" standard "is a

higher standard than the 'satisfactory reason' requirement of Local Civil Rule 1.4 and requires a

determination of which side is in fact responsible for the attorney-client conflict." *Diarama*

*Trading Co. v. J. Walter Thompson U.S.A., Inc.*, No. 01 Civ. 2950, 2005 WL 1963945, at *3

(S.D.N.Y. Aug. 15, 2005).[10]

"The mere fact that clients refuse to accept a settlement recommended by the attorney is

not ground for [the attorney's] withdrawal." *Borup v. Nat'l Airlines, Inc.*, 159 F. Supp. 808, 810

(S.D.N.Y. 1958). "It is the client who controls the decision as to whether a settlement offer is to

be accepted. . . . This decision is binding upon the attorney even though not in accordance with

[the attorney's] advice." *Marrero v. Christiano*, 575 F. Supp. 837, 839 (S.D.N.Y. 1983)

(alteration in original) (quoting *Suffolk Roadways, Inc. v. Minuse*, 287 N.Y.S.2d 965, 969 (Sup.

Ct. 1968)). An attorney may not act coercively by "threaten[ing] to withdraw [his] services from

[the client] without good cause and for [the attorney's] own economic benefit." *Brooks v. Lewin*,

853 N.Y.S.2d 286, 288 (App. Div. 1st Dep't 2008).

Based on this Court's Findings of Fact, the Court finds and concludes that Guzik resigned

from his representation of Albright on December 17, 2015. He was neither discharged nor

constructively discharged. Guzik's resignation was not based on good cause or reasonable

justification. This determination is based on the Court's evaluation of the evidence in several

respects.

---

[10] Local Civil Rule 1.4 governs when an attorney who has appeared as attorney of record
before this Court may be granted leave to withdraw.

First, Guzik's contention that he "lost trust" in Albright is not supported by the credible evidence. While LendIt may have hoped to exclude Guzik from the process — likely because it viewed him as an impediment to reaching a settlement — there is no evidence that Albright did anything untoward to exclude him. In fact, Albright promptly forwarded to Guzik the December 16 email from Jones proposing further settlement discussions without lawyers. Guzik did not lose "trust" in Albright in 2015 in any way that prevented his continued representation of her. *See, e.g.,* DX R4 (Jan. 22, 2016 email from Guzik) ("You are (still) one of a very small number of people I can trust in this industry."); *see also* DX O4. Albright did not "render[] the representation unreasonably difficult for the lawyer to carry out employment effectively." *Karimian*, 2011 WL 1900092, at *5 (internal quotation marks omitted). Nor did she subject Guzik to insults, refuse to cooperate, or cease communicating with him. Although Guzik and Albright had a rocky relationship at times, the breakdown of the relationship was brought about by Guzik — in particular, his refusal to abide by his client's desire to reach a settlement quickly and without extended acrimony with LendIt.[11]

Second, Guzik's contention that Albright was "usurping his function" as a lawyer is not supported by the evidence. Guzik testified that he was "shocked" and "alarm[ed]" on December 16 when Albright told him privately that she wanted to "settle this and move on with my life" by demanding a 15-percent interest in LendIt. (Tr. 155.) But Albright, as the client, had the right to decide the amount she would settle for. She also had the right to take into consideration her

_____

[11] The Court is also not persuaded by Guzik's suggestion (Tr. 543-45) that Albright effectively brought in "new or additional counsel who interferes with the strategies of the original attorney," *Louima*, 2004 WL 2359943, at *61, because she raised the possibility of turning over the Crowdnetic action to LendIt's lawyers. Albright merely raised this as a possible outcome in the event that there was a settlement with LendIt. It was never carried out. Moreover, it would not have precluded Guzik from continuing to represent Albright in connection with her dispute with LendIt. Nor was it the actual reason for Guzik's resignation.

desire not to unduly antagonize her once and future partners — something Guzik seemed to recognize after he quit. (*See* DX A4 ("What I did not account for at that time were what appear to be personal goals regarding the outcome of this matter – in particular as concerns your relationship with LendIt.").)  In any event, Guzik persuaded Albright *not* to present her 15-percent demand at the meeting, and Guzik's approach prevailed:  they presented a demand of 28-percent, which was promptly rejected by LendIt.[12]

Third, and relatedly, Guzik's position that he had the right, as a lawyer, to enforce an informal agreement giving him "complete control over every aspect of the case" (Tr. 99) is unreasonable and unjustified, to say the least.  While Guzik occasionally described this agreement in terms of "tactics" and "strategy" (Tr. 158), his real disagreement with Albright was her unwillingness to hold out and fight aggressively for a richer deal.  The evidence at trial showed that Guzik was invested in a richer deal in large part because it meant more money in his pocket.  He betrayed his true motivation when he told Albright, for example:  "You're leaving too much money on the table" (Tr. 483); "this is my money too" (Tr. 483); "my wife will kill me if we settle" (Tr. 483); and "this is serious business for me" (PX 175).  Similarly, Guzik's repeated comments that Albright's judgment was "clouded by emotion" (PX 116), and that his "confidence in [her] judgment" had been "undermined" (PX 175), reflect an attitude that can best be described as patronizing.  Such comments suggest that it was Guzik who was overly

---

[12] Nor did Guzik's suspicions about the genesis of the 15-percent figure — *i.e.*, that it reflected roughly two-thirds of the 22-percent figure and therefore suggested a scheme to cut him out of the process — provide just cause for him to resign.  There is no evidence in the record that that was LendIt's (or Albright's) thinking in arriving at the 15-percent figure.  But even if it had been, that would not have altered Guzik's entitlement to a recovery based on quantum meruit, so long as he remained Albright's lawyer.  Again, the client has the ultimate right to accept or reject a settlement, and the lawyer's view that it is too small, for whatever reason, does not provide good cause to resign.

personally and emotionally invested in his client's case, and his own control over it. Guzik also acted unduly coercively in threatening to withdraw two weeks before a summary judgment filing was due — and then withdrawing in the hope that he would be re-hired — because he wanted to hold out for a larger settlement.

Fourth, Guzik's communications around and after the time of his resignation support the Court's finding that he voluntarily resigned. For example, on the morning of December 17, 2015, Guzik wrote that if Albright did not want to take on LendIt, "that is your decision," and he "[w]ould rather walk away from this trainwreck and chalk it up to life experience." (PX 175.) In February he wrote to her: "I have no expectation of receiving any compensation from you at this juncture. Nor do I wish to engage in any negotiations with any client over fees. . . . I have made a decision to move on . . . ." (DX E5.) In resigning, Guzik took a gamble, hoping he could persuade Albright to change her mind and re-engage him, as she had in August 2014. He tried various approaches over time: conciliatory and vaguely apologetic (DX A4); resigned and passive-aggressive (DX E5); and finally angry and hostile (DX I9; DX L9). These various approaches ultimately confirm that what Guzik did on December 17, 2015 was exactly what he said at the time: "I quit." (Tr. 488.)[13]

In the end, Guzik resigned voluntarily. His reasons for resigning do not "rise to the . . . level of good cause required to overcome an attorney's responsibility to persist in a representation already begun." *Id.*

Accordingly, the Court finds in favor of Albright on Guzik's claim for quantum meruit.

_____

[13] Guzik called an expert witness, Steven A. Tasher, to testify about "the reasonable value of the legal services that were provided [by Guzik] to Ms. Albright." (Tr. 412.) In light of the Court's finding that Guzik voluntarily resigned without good cause, the Court need not and does not make findings or conclusions regarding the reasonable value of Guzik's legal services.

## B.   Albright's Defamation Claim

Under New York law, "defamation" encompasses "the twin torts of libel and slander." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (quoting *Hogan v. Herald Co.*, 446 N.Y.S.2d 836, 839 (App. Div. 4th Dep't 1982)).  Because Albright seeks to hold Guzik liable for his written statements, her defamation claim sounds in libel.  *See id.*  To prevail on her libel claim, Albright must establish five elements: "1) a written defamatory statement of fact concerning [her]; 2) publication to a third party; 3) fault (either negligence or actual malice depending on [her status]); 4) falsity of the defamatory statement; and 5) special damages or per se actionability."  *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

New York law defines a statement as defamatory if it "exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society.'"  *Id.* at 177 (alterations in original) (quoting *Kimmerle v. N.Y. Evening Journal, Inc.*, 262 N.Y. 99, 102 (1933)).  And certain categories of statement are considered defamatory per se, such that they are actionable even absent a showing of actual damages: "(1) those that accuse the plaintiff of a serious crime; (2) those that 'tend to injure another in his or her trade, business or profession'; (3) those that accuse the plaintiff of having a 'loathsome disease'; or (4) . . . those that impute 'unchastity to a woman.'"  *Stern v. Cosby*, 645 F. Supp. 2d 258, 273 (S.D.N.Y. 2009) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992)).

That said, New York recognizes that "[p]ublic policy mandates that certain communications, although defamatory, cannot serve as the basis for the imposition of liability in a defamation action."  *Rosenberg v. MetLife, Inc.*, 8 N.Y.3d 359, 365 (2007) (alteration in original) (quoting *Toker v. Pollak*, 44 N.Y.2d 211, 218 (1978)).  Thus, New York law has long

provided for "absolute immunity from liability for defamation . . . for oral or written statements made by attorneys in connection with a proceeding before a court 'when such words and writings are material and pertinent to the questions involved.'" *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 718 (2015) (quoting *Youmans v. Smith*, 153 N.Y. 214, 219 (1897)). This absolute privilege, where applicable, "embraces anything that may possibly or plausibly be relevant or pertinent, with the barest rationality, divorced from any palpable or pragmatic degree of probability." *Grasso v. Mathew*, 564 N.Y.S.2d 576, 578 (App. Div. 3d Dep't 1991).

In 2015, the New York Court of Appeals held that *pre*-litigation statements by an attorney that are "pertinent to a good faith anticipated litigation" are protected by a qualified privilege. *Front, Inc.*, 24 N.Y.3d at 720; *see also Yukos Capital S.A.R.L. v. Feldman*, No. 15 Civ. 4964, 2016 WL 4940200, at *4 (S.D.N.Y. Sept. 14, 2016). Unlike the absolute privilege, the qualified privilege may be overcome by proof "that the statements [at issue] were not pertinent to a good faith anticipated litigation." *Front, Inc.*, 24 N.Y.3d at 720; *Yukos Capital*, 2016 WL 4940200, at *6.

First, Albright claims that Guzik defamed her by alleging, in his January 2017 answer to her counterclaims in this action, that Albright faked a medical diagnosis to avoid paying him. (Tr. 511.) While this allegation appears to have been false and based on little if any evidence, it was nevertheless made in a court filing and was "material and pertinent to the questions involved." The Court therefore concludes that it was protected by the absolute privilege under New York law.

Second, Albright claims that Guzik defamed her by stating in emails to Chafizadeh (her lawyer after Guzik's resignation), that Albright was a "perpetrator" rather than a "victim" (DX X6), and that she lacked "credibility" (DX R5; DX R6). (*See* Tr. 512-13.) These statements

were made to Chafizadeh in the days and weeks leading up to Guzik's filing of this lawsuit.[14]

Viewed in context, it is clear that these communications related to Guzik's efforts to resolve

what had become, by late February 2016, a dispute with Albright regarding his claim for

attorney's fees.  They were therefore pertinent to anticipated litigation.  And while this Court has

ultimately found that Guzik is not entitled to such fees because he resigned without good cause,

the Court also concludes that he had a nonfrivolous argument for asserting a quantum meruit

claim (a claim that survived summary judgment and proceeded to trial).  Therefore, these

statements are protected by the qualified privilege.  Because the Court finds that these

communications were "pertinent to a good faith anticipated litigation," *Front, Inc.*, 24 N.Y.3d at

720, they do not support liability for defamation.

Accordingly, the Court finds in favor of Guzik on Albright's claim for defamation.

### C.      Albright's Claim for Intentional Infliction of Emotional Distress

To establish liability for intentional infliction of emotional distress under New York law,

a plaintiff must prove "(1) extreme and outrageous conduct, (2) intent to cause severe emotional

distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional

distress."  *Friedman v. Self Help Cmty. Servs., Inc.*, 647 F. App'x 44, 47 (2d Cir. 2016)

(summary order) (quoting *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996)).

Conduct rises to the requisite "extreme and outrageous" level only if it "so transcends the bounds

of decency as to be regarded as atrocious and intolerable in a civilized society."  *Id.* (quoting

---

[14] In the first email to Chafizadeh, dated February 29, 2016, Guzik stated that "your
client's credibility in this matter is nominal, at best."  (DX R5.)  In an email on March 22, 2016,
Guzik stated, "More stalling. Your client has zero credibility."  (DX R6.)  And in an email on
March 25, 2016, Guzik stated, "Your client is not a 'victim.' She is a perpetrator, and will be
dealt with accordingly, with the full protection of all applicable laws."  (DX X6.)  Guzik filed the
complaint in this case on March 28, 2016.  (*See* Dkt. No. 1.)

*Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014)). This requirement is "rigorous, and difficult to satisfy," such that "of the intentional infliction of emotional distress claims considered by [the New York Court of Appeals], *every one* has failed because the alleged conduct was not sufficiently outrageous." *Chanko v. Am. Broad. Cos.*, 27 N.Y.3d 46, 57 (2016) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122 (1993)).

Albright claims that Guzik is liable for intentional infliction of emotion distress based on his emails calling her a "scorned woman" and a criminal, and court filings accusing her of violating the law. (Tr. 514-17; DX I9; DX L9.)[15] There is no question that some of Guzik's communications were unprofessional and even "despicable." (Tr. 548.) It is unnecessary to decide whether his conduct rises to the high level of "extreme and outrageous," however, because Albright presented no evidence of "severe emotional distress." As this is an essential element of a claim for intentional infliction, the claim has not been proven. *See, e.g., Medcalf v. Walsh*, 938 F. Supp. 2d 478, 489-90 (S.D.N.Y. 2013).

Moreover, Albright seeks only injunctive relief on this claim. (Tr. 516.) And while she complains that Guzik's communications, particularly in connection with this lawsuit, have been frequent and harassing, she also acknowledged that they have not been a problem since Guzik retained counsel in this case (Tr. 516-17). In light of that fact, and the conclusion of this case, an injunction is not warranted in any event.

Accordingly, the Court finds in favor of Guzik on Albright's claim for intentional infliction of emotional distress.

---

[15] Although Albright mentioned additional exhibits in her summation, those other exhibits were not offered or admitted into evidence during the trial. (Tr. 517.)

**III.     Conclusion**

Based on the foregoing Findings of Fact and Conclusions of Law, the Court finds that Guzik has failed to establish his claim for quantum meruit, and Albright has failed to establish her claims for defamation and intentional infliction of emotional distress.  Judgment shall be entered accordingly, with no recovery by either party.

The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: July 25, 2019
       New York, New York

                                          J. PAUL OETKEN
                                    United States District Judge